Maria DAVALOS, Plaintiff,

v.

JACOBSEN DIVISION OF TEXTRON,
INC., Defendant.

No. 96–C–519.

United States District Court,
E.D. Wisconsin.

March 31, 1998.

Willie J. Nunnery, Nunnery Law Office, Madison, WI, for Plaintiff.

James T. Murray, Jr., Peterson, Johnson & Murray, Milwaukee, WI, for Defendant.

### DECISION AND ORDER

WARREN, Senior District Judge.

Before the Court is the summary judgment motion of defendant Jacobsen Division of Textron, Inc.[1] For the following reasons,

the motion is granted in part and denied in part.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following findings of fact derive from the parties' submissions of proposed findings pursuant to Local Rule 6.05 and are undisputed unless otherwise noted.

Jacobsen, a Wisconsin corporation located in Racine, Wisconsin, DFOF ¶ 2,[2] produces mowers, see DFOF ¶ 13. Jacobsen does not dispute that it is an employer within the meaning of Title VII of the Civil Rights Act of 1964. Answer ¶ 5.

Beginning in approximately May 1995, the projected production levels at Jacobsen required the company to seek new hires. Noble Aff. ¶ 5. As part of that hiring push, on June 12, 1995, Jacobsen hired plaintiff Maria Davalos, a Hispanic woman, in the "utility replacement" classification in Jacobsen's assembly department. DFOF ¶¶ 1, 5. Pursuant to a collective bargaining agreement between Jacobsen and its union local, Davalos was considered to be on probation for the first 60 days of her employment. DFOF ¶ 6; PFOF ¶ 34. During the probationary period Jacobsen could discharge the employee at its discretion. Afterwards, the employee could be discharged only for "just and proper cause." DFOF ¶ 6.

On June 19, 1995, Jacobsen hired a white male, Scott Jensen, as another probationary employee for the same classification and department in which Davalos had been placed. DFOF ¶ 27. Throughout their employment, Davalos and Jensen both were supervised by

---

1. The motion for summary judgment was filed within the time granted by a Court-ordered extension of the motion deadline. The Court granted the extension based upon defense counsel's representation that plaintiff's counsel approved. Plaintiff's counsel has since objected to the extension, indicating he had approved a two-day extension but not the two-week extension defendant requested from the Court. Plaintiff requests that the Court vacate the extension order and strike the summary judgment motion.

The motion to vacate will be denied. The Court generally permits extensions and very likely would have granted defendant's request for two additional weeks even if plaintiff's counsel had completely opposed such an extension. Al-

though the Court disapproves of an attorney misrepresenting an opposing counsel's stipulations, the summary judgment motion has nevertheless been fully briefed and the Court believes it better to address the motion and narrow the issues for trial rather than strike the motion for summary judgment as a sanction.

2. Citations to defendant's proposed findings of fact are abbreviated as "DFOF" followed by a paragraph number. Citations to plaintiff's responsive findings are similarly abbreviated as "PFOF." Defendant's proposed findings in reply are similarly abbreviated as "RFOF." Other citations to the record will identify a person's deposition or affidavit by page or paragraph or a party's exhibit by number.

Ellie Folk, a 22–year employee of Jacobsen. Folk at that time supervised a work force that was approximately 30% minority and 32% female. DFOF ¶¶ 7, 27.

Davalos was assigned to the start-up and assembly of the Greens King V mower, a product that was just coming on line at Jacobsen. DFOF ¶ 13. Davalos worked with two industrial engineers on the Greens King V line, Thomas Tighe and Troy Gueller. DFOF ¶ 14. She was allowed to work overtime. Davalos Dep. at 83.

In evaluating Davalos's work, Folk discussed her performance with another employee, David Ritacco, who stated that Davalos slowed down production on the assembly line. DFOF ¶ 8. Folk prepared an "Employee Performance Work Sheet" of Davalos and spoke with Davalos about it on July 26, 1995. DFOF ¶ 9. Prior to that date, Folk had not spoken with Tighe or Gueller regarding Davalos's performance. PFOF ¶ 51. Prior to July 26, Folk had never discussed Davalos's performance with Davalos, either. PFOF ¶ 54.

On the work sheet, Folk graded Davalos as providing an average volume of work and checked the boxes stating that Davalos's "[w]ork is good; [a] minimum amount of errors," that Davalos was "[w]ell informed so as to rarely need assistance," and that Davalos worked well with others and had a normal ability to grasp new ideas. Def. Exh. 2; Pl. Exh. F. Other grades were in the middle of the five available categories, although Folk says she does not give out grades in the low ranges. Id.; Folk Aff. ¶ 8. Folk gave Davalos an overall apprisal of "good," which was second only to "excellent." Folk commented on the form, however, that "[e]mployee needs to pick up her pace[;] steady but slow." Def. Exh. 2; Pl. Exh. F. Stanley L. Noble, Jacobsen's human resource director, either assisted in the preparation of the work sheet on Davalos or else signed off on it. PFOF ¶¶ 49, 50.

Folk did not check either of the "yes" or "no" boxes on the back of the performance worksheet in answer to the question "Should this employee be retained as a permanent employee?" Pl. Exh. F. When Folk sat down with Davalos to discuss the performance worksheet, however, Folk said something to the effect of "welcome aboard." PFOF ¶ 53. Folk later told Davalos that this remark was inappropriate, as Davalos still had to pass her probationary term. RFOF ¶ 53.

In contrast to Davalos's review worksheet, on Jensen's performance worksheet Folk gave him marks mainly in the highest and second highest of the five available categories and checked the "yes" box to recommend that Jensen be retained permanently. Pl. Exhs. F, O; Def. Exh. 4; RFOF ¶ 53. Folk's overall appraisal of Jensen, however, was, like Davalos's, "good," although slightly higher in the "good" range. Pl.Ex. O.

Jacobsen also evaluates workers' efficiency and performance through what is called a Work Center Efficiency Report. PFOF ¶ 78. An example of a work center efficiency report showed that other workers similarly situated to Davalos had low efficiency ratings, although there is no evidence regarding whether these other employees were probationary or regular employees. PFOF ¶ 80; RFOF ¶ 80.

At the beginning of August 1995, Davalos called in sick to work for four days, August 1 – 4. DFOF ¶ 19; Pl. Exh. J. According to Davalos and some medical evaluation forms submitted to the Court, she was off work because of a gastroenteritis attack. PFOF ¶ 57; Pl. Exhs. G, H.

While Davalos was out sick, plant manager Dan Murphy contacted the human resources department and spoke with assistant Becky Rovik. Murphy requested that Davalos be terminated because of her attendance and performance problems. DFOF ¶ 20. Subsequently, Rovik spoke via telephone with Noble, who was out of town, about Murphy's request. DFOF ¶ 21.

Before he left on his trip, Noble had no idea that Davalos would be terminated. PFOF ¶ 70. Noble had seen Folk's worksheet, however, and knew that Davalos did not have a background in assembly work but had been hired because she had a relative who worked for Jacobsen and because she presented herself as highly motivated and looking for an opportunity to prove herself. DFOF ¶ 22. Noble made the termination

decision and over the phone instructed Rovik to carry it out. DFOF ¶ 23; Noble Aff. ¶ 2.

Davalos returned to work on August 7, PFOF ¶ 57, at which time Folk directed Davalos to Rovik. Rovik told Davalos she was being fired because of her absences and low performance. Davalos Dep. at 77–78; Pl. Exh. I. According to Rovik's notes from the meeting,

> I explained to Maria that after reviewing her performance appraisal and her absences last week we have decided not to continue her employment. I told her that her performance was described as slow, but steady, and not improving.
> She said that she usually never misses work and last week she was truly sick, she had to go to the emergency room two times. She brought in paperwork from the doctor to verify it. She also asked for a second chance and said that she could work harder. She kept saying that she wished she had never gotten sick. I explained that this would have happened anyway because of her performance.

Pl. Exh. I.

It is unclear what reasons Murphy had for making his recommendation to have Davalos fired. (Neither party appears to have deposed Murphy in this case.) Davalos stated that she only had contact with Murphy once, on a Saturday for clean-up duties when he directed her to sweep the floor, Davalos Dep. at 33–34, 79, so she infers that Murphy could not have sufficient knowledge about her work performance. Noble, though, says he understood that Murphy based his recommendation on feedback from Tighe and Gueller on the Greens King V line. Noble Dep. at 8, 24. Murphy's secretary, Dorothy Garski, testified at her deposition that she thought Murphy hated women. Garski also said that Murphy once indicated something to the effect that there were just too many women at Jacobsen. PFOF ¶¶ 76, 77.

Although Folk was not personally involved in making the decision to release Davalos, she did not disagree with it. Folk Aff. at ¶ 10.

Meanwhile, Jensen had quickly shown an ability to grasp assembly procedures and perform them quickly. DFOF ¶ 28. Eventually, he was placed as an assembly repairman, *id.*, a position requiring more knowledge and skill than the general assembly tasks Davalos performed on the line, DFOF ¶ 29. But although Jensen demonstrated good mechanical and assembly skills, he could not maintain sufficient attendance. From his start date through August 22, 1995, Jensen was tardy twice and absent twice. Folk learned that Murphy was considering requesting Jensen's discharge because of these attendance problems. DFOF ¶ 30. Due to Jensen's abilities, Folk sought a way to keep him and spoke with Noble. As a result, on August 22, Noble discharged Jensen for absence problems and immediately rehired him as a new probationary employee to see if his attendance problem could be cured. DFOF ¶ 31; PFOF ¶ 64; RFOF ¶ 64. Jensen's attendance problems continued, however, and Noble terminated Jensen's employment on September 1, 1995. DFOF ¶ 32.

Other than Jensen, only one other probationary employee, a black man in the paint department, ever was terminated by Jacobsen and subsequently rehired. PFOF ¶ 73; RFOF ¶ 73. No woman on probationary status ever was terminated but subsequently rehired. PFOF ¶ 74; RFOF ¶ 74.

After Davalos's termination and Noble's return from his trip, Noble spoke with the industrial engineers who worked with Davalos, and they informed him of their difficulties she had in following directions and performing assembly tasks. Noble Aff. ¶ 15. Noble asked the engineers to memorialize their observations of Davalos's performance. *Id.* Tighe and Gueller signed memoranda, dated August 23 and August 29 respectively, criticizing Davalos's work. Pl. Exhs. L, M.

Davalos believes that she was fired because she is a woman and Hispanic. She received a right to sue letter from the Equal Employment Opportunity Commission on March 4, 1996, and filed this lawsuit less than two months later. DFOF ¶ 4, Complaint.

## II. *APPLICABLE LAW*

As is well known, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there

is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The presence of a genuine issue of material fact is to be determined by the substantive law controlling that case or issue. *Kendrick v. East Delavan Baptist Church,* 886 F.Supp. 1465, 1471 (E.D.Wis.1995). In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nevertheless, the mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there is a *genuine* issue of *material* fact," *id.* at 247–48, 106 S.Ct. 2505, meaning that the factual dispute must be outcome-determinative under governing law, *Contreras v. City of Chicago,* 119 F.3d 1286, 1291 (7th Cir.1997). " '[F]acts not outcome-determinative under the applicable law, though in dispute, may still permit the entry of summary judgment.' " *Contreras,* 119 F.3d at 1292 (quoting *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n,* 806 F.2d 146, 149 (7th Cir.1986)).

To defeat a properly supported motion for summary judgment, the opposing party must present specific and sufficient evidence that, if believed by a jury, would actually support a verdict in her favor. Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. A failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial and makes summary judgment appropriate. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

### III. *ANALYSIS*

Davalos's complaint asserts two claims: discrimination based on race and discrimination based on sex.

#### A. *Race Discrimination Claim*

In her brief in opposition to defendant's motion for summary judgment plaintiff abandoned any contention that her discharge was due to race discrimination. *See* Brief in Opposition (July 1, 1997). For instance, although sections of her brief are entitled "The Bias of Dan Murphy Towards Women," "Evidence of Men Being Treated Differently", and "Because Plaintiff Has Offered Direct Evidence of Initial Sex Discrimination, Summary Judgment Should Be Denied," no portion of the brief supports her claim that she was fired because she is hispanic.

Summary judgment on that claim therefore will be granted.

#### B. *Sex Discrimination Claim*

Title VII of the Civil Rights Act makes it an unlawful employment practice for an employer "to discharge any individual ... because of such individual's ... sex[.]" 42 U.S.C. § 2000e–2(a)(1).

Summary judgment motions in employment discrimination cases involve one of two familiar methods of proof. The first option to the plaintiff is the "direct" method, under which the plaintiff may show (either through direct or circumstantial evidence) that the employer's decision to take the adverse job action was motivated by an impermissible purpose. *Sattar v. Motorola, Inc.,* 138 F.3d 1164, 1168 (7th Cir.1998). Direct evidence has been described as that which, "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Randle v. LaSalle Telecommunications,* 876 F.2d 563, 569 (7th Cir.1989). The second option is the well-known "indirect," burden-shifting test of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which requires that the plaintiff assert a prima facie case of discrimination. *Id.* at 802–05, 93 S.Ct. 1817. The burden then shifts to the defendant to present evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Sattar,* 138 F.3d at 1168. Finally, if the employer succeeds in meeting that burden of production, the burden shifts back to the plaintiff to provide evidence that, if believed by the trier of fact, would show that the employer's reasons were a mere pretext for discrimination. *Id.*

Plaintiff asserts that she meets both the direct and indirect tests.

■ Davalos contends that her evidence of Murphy's biases and the fact that he instigated her discharge are direct evidence of discrimination. The Court believes Davalos fails the direct test. "[B]efore seemingly stray remarks will qualify as direct evidence of discrimination, the plaintiff must show that the remarks 'were related to the employment decision in question.'" *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1403 (7th Cir.1996) (quoting *McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686–87 (7th Cir.1991)). The evidence must "not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." *Randle*, 876 F.2d at 569. Even disregarding the questionable admissibility of the hearsay regarding Murphy's comment about too many women at Jacobsen, Davalos has not shown Murphy's comment to be related in any way—by timing or context—to his decision to request her termination. Garski said she left Jacobsen in 1993, Garski Dep. at 23, so Murphy's comment occurred at least *two years* prior to Davalos's termination date. Garski also said Murphy made the comment as part of a general criticism of the Jacobsen workforce being dumb and lazy and having too many women, *id.* at 24, not in regard to any employment decisions he was making.

Garski's belief that Murphy hated women also fails as direct evidence. As stated above, direct evidence cannot involve inference or presumption. Garski's feeling about Murphy requires an presumption upon a presumption—a presumption that her belief was correct, and a presumption that Murphy's prejudice infected the decision regarding Davalos two years later. No reasonable jury could base a verdict for Davalos upon that.

■ Thus, Davalos must use the indirect, burden-shifting method. She first must establish a prima facie case of sex and racial discrimination; without it her claim cannot withstand summary judgment. *Greenslade v. Chicago Sun–Times, Inc.*, 112 F.3d 853, 863 (7th Cir.1997). To raise a prima facie case of sex discrimination Davalos must show that: (1) she belongs to a protected class; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) the defendant treated similarly-situated male employees more favorably. *Id.* at 863.

Jacobsen does not dispute that elements (1) and (3) exist, but it does argue that Davalos fails to provide evidence establishing the others.

■ Jacobsen believes no reasonable jury could find that Davalos performed her job satisfactorily. The Court disagrees and believes that Davalos has submitted sufficient evidence to present an issue of material fact requiring trial. Although Jacobsen shows that coworkers criticized Davalos's performance, Davalos presents the efficiency reports indicating that other workers at times had lower efficiency ratings. While it may be true that Davalos does not establish whether those other employees were probationary, and thus dischargable like her, or regular, meaning they were harder to discharge, she nevertheless presents a minimum amount of evidence suggesting that her performance was within a range of low, but acceptable, efficiency. And although Folk rated Davalos only in the middling range on the performance worksheet (and does not give ratings at the low end of the scale) and Davalos's evaluation was not as high as, say, Jensen's, in several categories Folk—Davalos's direct supervisor—nevertheless gave Davalos an overall "good" rating (second only to "excellent") and welcomed her aboard at the end of the in-person evaluation discussion. In addition, prior to the evaluation discussion Davalos had not been informed of any performance problems. And Davalos was allowed to work overtime, which suggests that her abilities were acceptable. The overall rating, Folk's comments, and the lack of prior criticism support Davalos's contention that her performance was acceptable. Whether Davalos was a satisfactory employee thus is a jury question.

Next, in regard to element (4) of the prima facia case, Davalos contends that while she was fired for attendance problems, Jensen, who also had attendance problems, was given a second chance. According to Jacobsen, however, because Jensen quickly grasped assembly procedures, was doing more difficult work, performed better, and was rated higher in evaluations than Davalos, the two were not similarly situated. While Jensen was to be terminated for attendance problems, Da-

valos's termination was based upon attendance *and performance* problems, meaning, says Jacobsen, that their worthiness for rehire differed. The Court again disagrees. Although Davalos concedes that Jensen had good skills at the job while she herself had no prior experience, Davalos provides evidence that she and Jensen started right about the same time, had about the same probationary period, were hired for similar reasons and similar jobs, and were put into the same department. Those are strong similarities for purposes of the prima facie case. More importantly, on their performance worksheets—signed on the very same day—Folk rated both Davalos and Jensen as "good" overall. Even though at the time Folk completed these forms she may have decided to recommend hiring Jensen permanently while reserving judgment on Davalos, Folk's "welcome aboard" comments to Davalos in person suggest that Davalos was close to such a recommendation. In addition, the fact that the quality of Davalos's work performance is a jury question puts the similarity question also at issue; if the jury finds that she satisfied the job requirements, then similarity with Jensen more likely will be found as well. In sum, the Court believes a reasonable jury could find the two workers similar enough for purposes of analyzing the discrimination claim.

The burden next shifts to Jacobsen to provide a legitimate reason for discharging Davalos. As the above discussion indicates, Jacobsen proffers as its reason the fact that Davalos's performance was subpar. As probationary employees could be terminated for any nondiscriminatory reason, the proffered justification is a reasonable and legitimate one, and Jacobsen has provided sufficient evidence from Folk and Davalos's coworkers criticizing Davalos's performance to satisfy its burden of production.

■ The burden shifts back, then, to Davalos to provide evidence that the defendant's actions were not legitimate or were undertaken for reasons other than those proffered. *See Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. A plaintiff can establish pretext directly by showing "that a discriminatory reason more likely motivated the employer" or indirectly by establishing "that the employer's proffered reason is unworthy of cre-

dence." *Id.; Billups v. Methodist Hosp. of Chicago,* 922 F.2d 1300, 1303 (7th Cir.1991).

Once again, Davalos has no direct evidence. Although Murphy's statement regarding the number of women at Jacobsen (again ignoring its problems with admissibility) may imply that he instigated her termination because of bias, the actual decision to terminate Davalos was made by Noble while he talked with Rovik. No reasonable jury could find that Murphy's stray remark makes it likely that Jacobsen was motivated by sex discrimination when firing Davalos or by not giving her a second chance. Davalos has presented nothing even suggesting that Noble or Rovik had any discriminatory biases. Davalos has presented nothing even suggesting that Folk was biased in getting Jensen rehired.

■ Plaintiff therefore must provide some evidence that indicates Jacobsen's stated reason for her termination is unworthy of credence. Davalos may establish that Jacobsen's reason is not worthy of credence by showing that (1) it has no basis in fact, (2) it did not actually motivate the employer's decision, or (3) it was insufficient to motivate the discharge. *Jones v. Jones Bros. Constr. Corp.,* 879 F.2d 295, 299 (7th Cir.1989).

The Court finds that Davalos has met this burden by the slimmest of margins under (2) and (3) above. In regard to (3), the same evidence discussed above regarding Davalos's possibly satisfactory job performance also supports a finding that Jacobsen's claim of poor performance was insufficient to justify her discharge. In regard to (2), taking the evidence in the light most favorable to Davalos, the Court finds Jacobsen's procedures in this case somewhat suspect. Folk was Davalos's direct supervisor and on July 26, 1995, rated Davalos overall as "good." Less than two weeks later, Murphy, who had extremely little direct contact with Davalos, suddenly requested Davalos's termination, supposedly on performance grounds, without any prior input from Folk. Jacobsen does not dispute Davalos's proposed finding of fact that "[i]f a new Sub–Assembler is not performing adequately, the decision regarding performance is made by Folk and individuals working around the potential new employee."

PFOF ¶ 47; RFOF ¶ 47. Folk, also a woman, obviously had the authority and responsibility for evaluating Davalos's performance, yet Murphy did not seek her input and instead told Rovik that he based his request on information from two men involved on the Greens King V line.

Noble, then, failed to instruct Rovik to substantiate the information on Davalos and then terminate her employment. Instead, he fired first and only obtained supportive memoranda from Tighe and Gueller weeks later. Add to this suspicious "fire now and justify it later" procedure the fact that Jensen, a man, was given a second chance while Davalos was not, and Davalos just barely gets herself to trial through the inference that her performance was not the real reason for her termination. Add to both of these things the suggestion that Murphy disliked women in the workplace and denial of the summary judgment motion on this claim appears even more proper.[3]

For the above reasons, summary judgment on the sex discrimination claim will be denied.

### C. *Damages*

In its motion for summary judgment defendant asks the Court to decide as a matter of law that Davalos failed to mitigate her damages. At her deposition, Davalos stated that soon after she was fired she went to an unemployment office but did not go to any businesses seeking employment and at some point stopped actively looking for work. She admitted that since she was fired by Jacobsen her only work had been at her husband's grocery store and restaurant, for which she received no wages.

A Title VII victim is presumptively entitled to full relief. *Hutchison v. Amateur Electronic Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir.1994). Once a plaintiff has established the amount of damages she claims resulted from her employer's conduct, the burden of going forward shifts to the defendant to show that the plaintiff failed to mitigate her damages or that damages were in fact less than the plaintiff asserts. *Id.* To establish the affirmative defense of failure to mitigate damages the defendant must show that: (1) the plaintiff failed to exercise reasonable diligence to mitigate her damages, and (2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence. *Id.*

Summary judgment on this issue is inappropriate for two reasons. First, the issue of mitigation generally is a question of fact for the jury. *Smith v. Great American Restaurants, Inc.*, 969 F.2d 430, 438 (7th Cir.1992). Second, as stated above, the burden is on defendant to show that plaintiff might have found comparable work, and Jacobsen has submitted no evidence whatsoever on that point. Moreover, self-employment can constitute employment for purposes of mitigating damages, as long as the self-employment was a reasonable alternative to finding other comparable employment. *Id.* The analysis of whether Davalos's family-based employment was sufficient or whether she reasonably tried to find and could have found other employment are matters for the jury at trial.

### IV. *ONE FINAL MATTER*

This case is one of the very last remaining on this senior district judge's civil docket, as he has been transitioning into retirement over the last couple of months. Now that this motion has been decided, the Court has determined that the case should be transferred to another district judge for all further proceedings.

### V. *CONCLUSION*

**THEREFORE, IT IS ORDERED** that plaintiff's motion to vacate the Court's order extending the time for defendant to file this motion is **DENIED**.

**FURTHER, IT IS ORDERED** that defendant's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted in regard to plaintiff's race discrimination claim and de-

---

**3.** Because of the questionable admissibility of Murphy's statement, the Court wishes to make clear that its ruling finding Davalos has sufficient evidence to get to trial does not depend on that statement. The Court declines to decide the admissibility question at this point, leaving that decision until trial.

nied in regard to plaintiff's sex discrimination claim and the mitigation of damages issue.

**FURTHER, IT IS ORDERED** that this case be **RETURNED TO THE CLERK OF COURT** for reassignment to another district judge for further proceedings.